# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 31, 2013

Lyle W. Cayce

Clerk

No. 13-51008

PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH SERVICES; PLANNED PARENTHOOD CENTER FOR CHOICE; PLANNED PARENTHOOD SEXUAL HEALTHCARE SERVICES; PLANNED PARENTHOOD WOMEN'S HEALTH CENTER; WHOLE WOMAN'S HEALTH; AUSTIN WOMEN'S HEALTH CENTER; KILLEEN WOMEN'S HEALTH CENTER; SOUTHWESTERN WOMEN'S SURGERY CENTER; WEST SIDE CLINIC, INCORPORATED; ROUTH STREET WOMEN'S CLINIC; HOUSTON WOMEN'S CLINIC, each on behalf of itself, its patients and physicians; ALAN BRAID, M.D.; LAMAR ROBINSON, M.D.; PAMELA J. RICHTER, D.O., each on behalf of themselves and their patients,

Plaintiffs–Appellees,

v.

GREGORY ABBOTT, Attorney General of Texas; DAVID LAKEY, M.D., Commissioner of the Texas Department of State Health Services; MARI ROBINSON, Executive Director of the Texas Medical Board,

Defendants–Appellants.

Appeal from the United States District Court
for the Western District of Texas

Before OWEN, ELROD, and HAYNES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

　　Planned Parenthood of Greater Texas Surgical Health Services and other plaintiffs brought suit seeking a permanent injunction against the enforcement of two amendments to the laws of Texas pertaining to the

performance of abortions (2013 Texas House Bill No. 2 ("H.B. 2")). At the conclusion of a bench trial, the district court held that parts of the legislation were unconstitutional and granted, in large measure, the requested injunctive relief. The Appellants, to whom we will refer as "the State," have appealed and have filed an emergency motion to stay the district court's permanent injunction pending the resolution of their appeal. We grant, in part, the motion for a stay pending appeal.

# I

On July 12, 2013, the Texas Legislature passed H.B. 2.[1] Two of its provisions are at issue. The first requires that a physician performing or inducing an abortion have admitting privileges, on the date of the procedure, at a hospital no more than thirty miles from the location at which the abortion is performed or induced.[2] The second limits the use of abortion-inducing drugs to a protocol authorized by the United States Food and Drug Administration (FDA), with limited exceptions.[3] Abortions induced by drugs, as distinguished from surgical abortions, are denominated by the parties as "medication abortions," and we use that terminology here.

The provisions of H.B. 2 under consideration were scheduled to take effect October 29, 2013.[4] On September 26, Planned Parenthood and others[5] brought an action challenging their constitutionality. With regard to the requirement of hospital admitting privileges, Planned Parenthood asserted

---

[1] Act of July 12, 2013, 83rd Leg., 2d C.S., ch. 1, §§ 1-12, 2013 Tex. Sess. Law Serv. 4795-802 (West) (to be codified at TEX. HEALTH & SAFETY CODE §§ 171.0031, 171.041-048, 171.061-064, & amending § 245.010.011; TEX. OCC. CODE amending §§ 164.052 & 164.055).

[2] *Id.* § 2.

[3] *Id.* § 3; *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, No. 1:13-CV-862-LY, 2013 WL 5781583, at *8 (W.D. Tex. Oct. 28, 2013).

[4] *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 2013 WL 5781583, at *1.

[5] This opinion refers to all plaintiffs collectively as "Planned Parenthood."

2

that patients have rights to liberty and privacy guaranteed by the Due Process Clause of the 14th Amendment that would be violated, the procedural due process rights of physicians and their patients would be violated, the provision is void for vagueness, and the provision is invalid because it unlawfully delegates control over the exercise of constitutional rights to private parties. The medication abortions restriction, Planned Parenthood contended, would violate liberty and privacy rights and is void for vagueness.

On October 28, following a three-day bench trial, the district court issued an opinion holding that the hospital-admitting-privileges requirement of H.B. 2 was unconstitutional because it was "without a rational basis and places a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[6] The district court upheld the medication abortions restriction as constitutional, "except when a physician finds such an abortion necessary, in appropriate medical judgment, for the preservation of the life or health of the mother."[7] The district court entered a final judgment declaring H.B. 2 unconstitutional in part and enjoining its enforcement with respect to the hospital-admitting-privileges provision in its entirety.[8] The final judgment enjoined the medication abortions provision to a greater extent than the court had indicated it would in its Memorandum Opinion Incorporating Findings of Fact and Conclusions of Law.

The State appealed the district court's decision the same day the final judgment was entered. The only issue before this panel is the disposition of

---

[6] *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 2013 WL 5781583, at *2.

[7] *Id.*

[8] *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, No. 1:13-CV-862-LY (W.D. Tex. Oct. 28, 2013) (final judgment).

the State's motion to stay the district court's permanent injunction pending the outcome of the appeal on the merits.

## II

We consider four factors in deciding whether to grant a stay pending appeal: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"[9]  A stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant."[10]

Although the State did not seek a stay in the district court, as it would ordinarily be required to do,[11] a motion for a stay pending appeal can first be made in this court if moving in the district court initially would be impracticable.[12]  Planned Parenthood does not contend that the State should have sought relief in the district court before proceeding here, and we note that H.B. 2 was to have taken effect on October 29, 2013, the day after the district court issued its opinion and final judgment.

## III

We first consider the hospital-admitting-privileges provision of H.B. 2 and whether the State has made a strong showing that it is likely to succeed on the merits.  We conclude that it has.

---

[9] *Nken v. Holder*, 556 U.S. 418, 425-26 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (same); *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 893 (5th Cir. 2012) (unpublished) (same).

[10] *Nken*, 556 U.S. at 427 (citation omitted).

[11] FED. R. APP. P. 8(a)(1)(A) ("A party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal.").

[12] FED. R. APP. P. 8(a)(2)(A)(i).

## A

Planned Parenthood contends, and the district court concluded, that the hospital-admitting-privileges requirement has no rational basis.[13] The district court focused primarily on emergency room treatment of women experiencing complications following an abortion.[14] This overlooks substantial interests of the State in regulating the medical profession[15] and the State's interest in "'protecting the integrity and ethics of the medical profession.'"[16] As the Supreme Court has noted, "the State has 'legitimate concern for maintaining high standards of professional conduct' in the practice of medicine."[17] The Supreme Court has also consistently recognized that "[r]egulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden."[18]

The State offered more than a "conceivable state of facts that could provide a rational basis"[19] for requiring abortion physicians to have hospital admission privileges. The State offered evidence that such a requirement fosters a woman's ability to seek consultation and treatment for complications directly from her physician, not from an emergency room provider. There was evidence that such a requirement would assist in preventing patient abandonment by the physician who performed the abortion and then left the patient to her own devices to obtain care if complications developed. The

---

[13] *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, No. 1:13-CV-862-LY, 2013 WL 5781583, at *5-7 (W.D. Tex. Oct. 28, 2013).

[14] *Id.* at *4-5.

[15] *See Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("Under our precedents it is clear the State has a significant role to play in regulating the medical profession.").

[16] *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)).

[17] *Id.* (quoting *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954)).

[18] *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992).

[19] *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

district court's finding to the contrary is not supported by the evidence, and in any event, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."[20]

The requirement that physicians performing abortions must have hospital admitting privileges helps to ensure that credentialing of physicians beyond initial licensing and periodic license renewal occurs. Dr. James Anderson stated that "[h]ospital staff privileges are dependent on [the credentialing] review," and that such credentialing reviews "help[] maintain a quality medical staff and quality patient care." Dr. John Thorp explained that the hospital-admitting-privileges requirement would ensure that only physicians "credentialed and board certified to perform procedures generally recognized within the scope of their medical training and competencies" would provide abortions. He noted that due to the "unique nature of an elective pregnancy termination and its likely underreported morbidity and mortality, it is appropriate and necessary to provide increased provider safeguards through hospital credentialing and privileging." Dr. Anderson echoed this sentiment, noting that "hospital credentialing acts as another layer of protection for patient safety."

The district court's conclusion that a State has no rational basis for requiring physicians who perform abortions to have admitting privileges at a hospital is but one step removed from repudiating the longstanding recognition by the Supreme Court that a State may constitutionally require that only a physician may perform an abortion.[21] In *Mazurek v. Armstrong*,[22] the state of Montana enacted a statute restricting the performance of an abortion to

---

[20] *Id.* at 315.

[21] *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 974 (1997).

[22] 520 U.S. 968 (1997).

licensed physicians.[23] A physician-assistant and physicians challenged the law; the district court denied their request to preliminarily enjoin the law's effect; and the Ninth Circuit Court of Appeals vacated that denial, concluding that those challenging the restriction "had shown a 'fair chance of success on the merits.'"[24] The Supreme Court reversed, reasoning that in earlier decisions, it had "emphasized that '[o]ur cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, *even if an objective assessment might suggest that those same tasks could be performed by others*.'"[25] The Supreme Court made clear in *Mazurek* that "[t]he Court of Appeals' decision is also contradicted by our repeated statements in past cases . . . that the performance of abortions may be restricted to physicians."[26] The Court emphasized, "our prior cases 'left no doubt that, to ensure the safety of the abortion procedure, the States may mandate that only physicians perform abortions.'"[27]

In rejecting a constitutional challenge to an abortion regulation similar to that presently before our court, the Eighth Circuit held that a state statute requiring physicians performing abortions to maintain surgical privileges at a hospital providing obstetrical and gynecological care "furthers important state health objectives."[28] We have little difficulty in concluding that, with regard

---

[23] *Id.* at 969.

[24] *Id.* at 969-70 (citation omitted).

[25] *Id.* at 973 (emphasis and alteration in original) (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 885 (1992).

[26] *Id.* at 974.

[27] *Id.* at 974-75 (quoting *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 447 (1983)).

[28] *Women's Health Ctr. of W. Cnty., Inc. v. Webster*, 871 F.2d 1377, 1381 (8th Cir. 1989).

to the district court's rational basis determination, the State has made a strong showing that it is likely to prevail on the merits.

## B

The district court concluded that even if the hospital-admitting-privileges requirement had a rational basis, Planned Parenthood's facial challenge should be sustained because the hospital-admitting-privileges requirement constituted an undue burden on the right of a woman to an abortion and presented a substantial obstacle to access to abortion services.[29] The Supreme Court's most recent decision addressing a facial attack on abortion legislation, *Gonzales v. Carhart*,[30] provides considerable guidance in addressing this issue.

The Supreme Court "assume[d]" in *Gonzales* that "[b]efore viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy,'"[31] and that a State "also may not impose upon this right an undue burden, which exists if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'"[32] The Court subsequently explained that "[t]he question is whether the Act, measured by its text in this facial attack, imposes a substantial obstacle to . . . previability[] abortions."[33] The Court concluded

---

[29] *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, No. 1:13-CV-862-LY, 2013 WL 5781583, at *5-7 (W.D. Tex. Oct. 28, 2013).

[30] 550 U.S. 124 (2007).

[31] *Gonzales*, 550 U.S. at 146 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992)).

[32] *Id.* (quoting *Casey*, 505 U.S. at 878); *see also id.* at 156.

[33] *Id.* at 156.

that the Act did not on its face impose a substantial obstacle, and it "reject[ed] this further facial challenge to its validity."[34]

We similarly conclude that the provisions of H.B. 2 requiring a physician who performs an abortion to have admitting privileges at a hospital, "measured by [their] text," do not impose a substantial obstacle to abortions. Just as the Supreme Court concluded in *Gonzales* with regard to the federal Partial-Birth Abortion Ban Act of 2003[35] that "[t]here can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession,'"[36] there can be no doubt that the State of Texas has this same interest, as well as an interest in protecting the health of women who undergo abortion procedures.

There is the possibility, if not the probability, however, that requiring all physicians who perform abortions to have admitting privileges at a hospital may increase the cost of accessing an abortion provider and decrease the number of physicians available to perform abortions. As the district court correctly recognized, the Supreme Court has nevertheless held that "'[t]he fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.'"[37]

That H.B. 2's text does not facially indicate that its purpose is "'to place a substantial obstacle in the path of a woman seeking an abortion'" does not end the inquiry.[38] "The [bill's] furtherance of legitimate government interests

---

[34] *Id.*

[35] 18 U.S.C. § 1531.

[36] *Gonzales*, 550 U.S. at 157 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)).

[37] *Id.* at 157-58 (quoting *Casey*, 505 U.S. at 874).

[38] *Id.* at 160 (quoting *Casey*, 505 U.S. at 878).

9

bears upon, but does not resolve, the next question: whether the [bill] has the effect of imposing an unconstitutional burden on the abortion right."[39]

We note that Planned Parenthood has brought only a facial challenge to the hospital-admitting-privileges requirement in H.B. 2. Such a challenge "impose[s] 'a heavy burden' upon the part[y] maintaining the suit."[40] There are diverging views as to "[w]hat that burden consists of in the specific context of abortion statutes," as the Supreme Court recognized in *Gonzales*.[41] The State argues that in *Barnes v. Mississippi*,[42] our Circuit embraced the view that "[a] facial challenge will succeed only where the plaintiff shows that there is *no* set of circumstances under which the statute would be constitutional."[43] Even assuming arguendo that our statements in *Barnes* and our precedents that preceded it were not binding on this panel, which we do not intimate, and that we are obligated by *Casey* to consider whether there is an undue burden "in a large fraction of the cases in which" the admitting privilege is relevant, the State has shown a strong likelihood of success on the merits in this facial challenge.

---

[39] *Id.* at 161.

[40] *Id.* at 167 (quoting *Rust v. Sullivan*, 500 U.S. 173, 183 (1991)).

[41] *Id.* (comparing *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990) (indicating that in "making a facial challenge to a statute, [the challenger] must show that no set of circumstances exists under which the Act would be valid") with *Casey*, 505 U.S. at 895 (indicating that a spousal-notification statute would impose an undue burden "in a large fraction of the cases in which [it] is relevant" and holding the statutory provision facially invalid)); *see also Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175-80 (1996) (Justice Stevens and Justice Scalia disagreeing on the appropriate standard for a facial challenge in dueling memorandum opinions that respect and dissent, respectively, from the denial of the petition for certiorari).

[42] 992 F.2d 1335 (5th Cir. 1993).

[43] *Id.* at 1342 (emphasis in original); *see also Barnes v. Moore*, 970 F.2d 12, 14 (5th Cir. 1992) ("Because the plaintiffs are challenging the facial validity of [a Mississippi abortion statute], they must 'establish that no set of circumstances exists under which the Act would be valid.'") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

No. 13-51008

The hospital-admitting-privileges requirement applies to any physician who performs an abortion in Texas. As a consequence, every woman in Texas who seeks an abortion will be affected to some degree. The question in a "large fraction" analysis would be whether the requirement imposes an undue burden on a large fraction of women in Texas seeking an abortion. Planned Parenthood contended at trial that approximately 22,000 women across Texas would not have access to a physician who performs abortions. The district court did not make such a finding, and Planned Parenthood does not challenge the failure to make such a finding in the present proceeding. The district court made findings only with regard to 24 counties in the Rio Grande Valley, and the district court accepted Planned Parenthood's prediction that those counties "would be left with no abortion provider because those providers do not have admitting privileges and are unlikely to get them."[44]

To place the district court's findings with regard to 24 counties in the Rio Grande Valley into perspective, there are 254 counties in Texas, and Planned Parenthood's evidence showed that well before H.B. 2 was to take effect, abortions were performed in only 13 counties in Texas. There was evidence offered by Planned Parenthood that more than 90% of the women seeking an abortion in Texas would be able to obtain an abortion from a physician within 100 miles of their respective residences even if H.B. 2 went into effect. This does not constitute an undue burden in a large fraction of the relevant cases.

The district court's opinion reflects on its face that with respect to the Rio Grande Valley, many factors other than the hospital-admitting-privileges requirement would affect the availability of physicians to perform abortions. These include the fact that most of the physicians currently performing

---

[44] *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, No. 1:13-CV-862-LY, 2013 WL 5781583, at *5 (W.D. Tex. Oct. 28, 2013).

abortions in this area are over the age of 60, and more than half are over the age of 70. Other physicians that abortion providers have attempted to recruit to replace retiring physicians and physicians who have left the abortion practice are not attracted to the Rio Grande Valley area for various reasons unrelated to the hospital-admitting-privileges requirement.[45] This is undisputed evidence that was cited by the district court in its opinion.[46]

For residents of the Rio Grande Valley, it is also undisputed that physicians with hospital privileges would be available in Corpus Christi to perform abortions if H.B. 2 went into effect and that the distance from the Rio Grande Valley to Corpus Christi is less than 150 miles. In *Casey*, the Supreme Court considered whether a Pennsylvania statute that de facto imposed a twenty-four-hour waiting period on women seeking abortions constituted an undue burden.[47] The Court concluded that it did not, despite the fact that it would require some women to make two trips over long distances.[48] An increase in travel distance of less than 150 miles for some women is not an undue burden on abortion rights.

A witness for one abortion provider attempted to minimize the fact that abortion physicians would be available in Corpus Christi even if H.B. 2 went into effect. She testified that many women from the Rio Grande Valley area who seek abortions are not citizens and their visas will not permit them to

---

[45] *See generally K.P. v. LeBlanc*, 729 F.3d 427, 442 (5th Cir. 2013) (noting that "while 'government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those' obstacles, like Louisiana's dearth of affordable insurance, that are 'not of [the government's] own creation'") (alteration in original) (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)).

[46] *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 2013 WL 5781583, at *5-6.

[47] *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 885-87 (1992).

[48] *Id.*

travel beyond certain checkpoints, such that travel to Corpus Christi is not an option for them. This obstacle is unrelated to the hospital-admitting-privileges requirement.[49]

It is also undisputed that in a number of areas in Texas, physicians who are performing abortions do have admitting privileges. It is further undisputed that under both state and federal law, hospitals are prohibited from discriminating against physicians who perform abortions in determining if admitting privileges will be extended.[50] There is undisputed evidence that many hospitals extend admitting privileges without regard to the number of hospital admissions that a physician has had in the past. The district court did not make findings as to the number of hospitals in the Rio Grande Valley area that had annual admissions requirements. The court's only finding was that "if required by the hospital," abortion physicians' practices do not generally yield any hospital admissions.[51] Even if some hospitals have annual

---

[49] *Cf. LeBlanc*, 729 F.3d at 442.

[50] Texas law specifically prohibits discrimination by hospitals or health care facilities against physicians who perform abortions. "A hospital or health care facility may not discriminate against a physician, nurse, staff member, or employee because of the person's willingness to participate in an abortion procedure at another facility." TEX. OCC. CODE ANN. § 103.002(b) (West 2013). Texas law further provides a private cause of action for an individual to enforce this non-discrimination right. "A person whose rights under this chapter are violated may sue a hospital, health care facility, or educational institution . . . for: (1) an injunction against any further violation; (2) appropriate affirmative relief, including admission or reinstatement of employment with back pay plus 10 percent interest; and (3) any other relief necessary to ensure compliance with this chapter." *Id.* § 103.003. Federal law similarly prohibits any entity that receives a "grant, contract, loan, or loan guarantee under the Public Health Service Act, the Community Mental Health Centers Act, or the Developmental Disabilities Services and Facilities Construction Act" or a "grant or contract for biomedical or behavioral research under any program administered by the Secretary of Health and Human Services" from discriminating "in the extension of staff or other privileges to any physician or other health care personnel . . . because he performed or assisted in the performance of a lawful sterilization procedure or abortion." 42 U.S.C. § 300a-7(c).

[51] *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 2013 WL 5781583, at *5.

admission requirements, it is hardly surprising that the physicians identified by the plaintiffs have virtually no history of hospital admissions since the experts presented by the plaintiffs argued that it is the practice of many abortion physicians to instruct their patients to seek care from an emergency room if complications arise.

There is a substantial likelihood that the State will prevail in its argument that Planned Parenthood failed to establish an undue burden on women seeking abortions or that the hospital-admitting-privileges requirement creates a substantial obstacle in the path of a woman seeking an abortion.

**IV**

We also conclude that the State has made a strong showing of likelihood of success on the merits, at least in part, as to its appeal of the injunction pertaining to medication abortions. A medication abortion is an alternative to surgical abortion and involves the use of two different drugs—mifepristone and misoprostol—to terminate pregnancy.

The FDA approved mifepristone for the purpose of medication abortion in 2000, within certain parameters as to its use, dosage, and administration. This approved use—known as "the FDA protocol"—includes limiting the drug's use to the first 49 days following the woman's last menstrual period (LMP), setting conditions for administering both mifepristone and misoprostol to patients, and prescribing dosage levels.

Physicians have nonetheless developed an "off-label protocol" for the use of mifepristone in medication abortions, which the district court concluded "has become the *de facto* standard of care in Texas" and "accounts for the vast majority of medication abortions performed nationwide since 2007."[52]

---

[52] *Id.* at *7.

Compared to the FDA protocol, the off-label protocol prescribes mifepristone to be taken at a lower dosage, lowers the misoprostol dosage, and allows a patient to take the misoprostol at home, without the presence of health care professionals. Cramps, bleeding, and the expulsion of the fetus typically occurs shortly after the ingestion of the misoprostol. The off-label protocol requires a maximum of two visits to a health care professional after the decision to have an abortion has been reached (once for administration of mifepristone and again for a follow-up visit), while the FDA protocol requires a maximum of three visits (an additional visit for the administration of misoprostol within 24 to 36 hours after the administration of mifepristone). For purposes of this appeal, the most significant difference between the FDA protocol and the off-label protocol is that the latter permits medication abortions to occur up to 63 days after the woman's LMP, while the FDA protocol limits the time within which a medication abortion can occur to 49 days since the LMP.

In H.B. 2, the Texas legislature has restricted the use of medication abortion to the FDA protocol, with certain exceptions not pertinent to the issues before us. Planned Parenthood sought to enjoin the FDA protocol requirement in its entirety so that abortion physicians could continue to use off-label protocol for medication abortions.

The district court found that both the FDA protocol and the off-label protocols are safe and effective for medication abortions. The district court rejected Planned Parenthood's argument that increased costs and time involved in obtaining a medication abortion using the FDA protocol as compared to the off-label protocol rendered H.B. 2's requirements unconstitutional. Planned Parenthood has not sought review of this determination.

However, the district court did find that "there are certain situations where medication abortion is the only safe and medically sound option for

women with particular physical abnormalities or preexisting conditions."[53] The court concluded that "[i]n the case of a woman for whom surgical abortion represents a significant health risk due to a physical condition beyond her control, the medication-abortion restrictions contained in House Bill 2 act as a total method ban after 49 days [after the] LMP."[54]  The district court concluded that for such women, H.B. 2 was an undue burden.  Consequently, it held that "the medication-abortion provisions may not be enforced against any physician who determines, in appropriate medical judgment, to perform a medication-abortion using the off-label protocol for the preservation of the life or health of the mother."[55]

The State challenges the district court's decision to create a "health exception" to H.B. 2's regulation of medication abortions on several grounds. The State first argues that states may limit the use of abortion-inducing drugs to the specific protocols approved by the FDA, and physicians and patients have no constitutional right to use off-label protocols that the FDA has not approved as safe and effective "even if an individual patient could demonstrate a strong medical need for those drugs."  The State also contends that patients with conditions that make surgical abortion impractical will still have access to abortion-inducing drugs up to 49 days after the LMP under the Texas law and that the State is not constitutionally required to authorize off-label protocols simply because a woman failed to discover a pregnancy or failed to decide to have an abortion until she is 50 to 63 days from LMP.  Additionally, the State contends that there is no need for "a vague and amorphous 'health' exception" since H.B. 2 provides an exception when an abortion is necessary to

---

[53] *Id.* at *10.

[54] *Id.* at *10.

[55] *Id.* at *11.

avert the death or substantial and irrevocable physical impairment of a major bodily function of the pregnant women.[56]

The State's arguments present complex issues, and we cannot say that the State has made the necessary strong showing of a likelihood of success on the merits. In so saying, we do not prejudge the outcome of these issues on appeal. We conclude only that a stay of the injunction on these grounds pending appeal is not appropriate.

However, the State contends, and we agree, that the "health exception" imposed by the district court is broader than necessary to remedy the undue burden found by the district court. The district court's basis for declaring part of the FDA protocol provisions unconstitutional was that "there are certain situations where medication abortion is the only safe and medically sound option for women with particular physical abnormalities or preexisting conditions."[57] All of the "physical abnormalities or preexisting conditions" that the district court found supported the need for injunctive relief are physical, not emotional or mental, conditions.[58] The need for the off-label protocol found by the district court is applicable only to women who are 50 to 63 days after the LMP, as the district court explained. The FDA protocol is relatively safe and effective, and most importantly, it is available for women up to 49 days after the LMP. But the injunction imposed by the district court's Final Judgment goes further than the court's reasons and findings support. The

---

[56] H.B. 2 § 1(4)(B) ("[T]his Act does not apply to abortions that are necessary to avert the death or substantial and irreversible physical impairment of a major bodily function of the pregnant woman.").

[57] *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 2013 WL 5781583, at *10.

[58] *See id.* at *9 n. 18.

Final Judgment "declares that the following portions of [H.B. 2] are unconstitutional":

> 2. The proposed amendment to the Health and Safety Code of the State of Texas adding section 171.063(a)(2), (b), (c), (e), and (f) found in Section 3 of the act at page 10, lines 1 through 27 and page 11 lines 1 through 24, to the extent those provisions prohibit a medication abortion where a physician determines in appropriate medical judgment, such a procedure is necessary for the preservation of the life or health of the mother.[59]

The sweep of this injunction is not limited to women who are 50 to 63 days after the LMP. The injunction also permits "a physician," meaning any physician rather than the physician who is to perform the abortion, to make the requisite determinations.

The Final Judgment also removes the requirement in § 171.063(c) that before the physician may dispense or administer an abortion-inducing drug, he or she must examine the pregnant woman and document, in the patient's medical record, the gestational age, and intrauterine location of the pregnancy. The injunction similarly inexplicably removes the requirement in § 171.063(e) that the physician schedule a follow-up visit for a woman who has received an abortion-inducing drug not more than 14 days after the administration of the drug and the requirement that at that follow-up visit, the physician must determine whether the pregnancy is completely terminated and assess the degree of bleeding. The injunction likewise removes the applicability of § 171.063(f), which also pertains to the follow-up visit. There is no indication from the district court's opinion that there is any constitutional infirmity in these sections. The injunction is overly broad in these respects.

---

[59] *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, No. 1:13-CV-862-LY (W.D. Tex. Oct. 28, 2013) (final judgment).

No. 13-51008

Pending appeal, we stay the injunction in the Final Judgment pertaining to medical abortions with this exception: the district court's injunction continues to apply pending appeal with respect to a mother who is 50 to 63 days from her last menstrual period if the physician who is to perform an abortion procedure on the mother has exercised appropriate medical judgment and determined that, due to a physical abnormality or preexisting condition of the mother, a surgical abortion is not a safe and medically sound option for her.

## V

The State has made an adequate showing as to the other factors considered in determining a stay pending appeal. When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.[60] As the State is the appealing party, its interest and harm merges with that of the public.[61] While we acknowledge that Planned Parenthood has also made a strong showing that their interests would be harmed by staying the injunction, given the State's likely success on the merits, this is not enough, standing alone, to outweigh the other factors. We have addressed only the issues necessary to rule on the motion for a stay pending appeal, and our determinations are for that purpose and do not bind the merits panel.[62]

\*   \*   \*

---

[60] *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, Circuit Justice); *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, Circuit Justice).

[61] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[62] *See generally Matthern v. Eastman Kodak Co.*, 104 F.3d 702, 704 (5th Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

No. 13-51008

IT IS ORDERED that Appellants' opposed motion for stay pending appeal is GRANTED and the district court's injunction orders are STAYED, in part, until the final disposition of this appeal, in accordance with this opinion.

The State has requested expedited briefing and oral argument on the merits, and Planned Parenthood indicated that it would not oppose expedited consideration if the State's motion to stay the district court's injunction were granted. IT IS FURTHER ORDERED that Appellants' motion for expedited briefing and oral argument is GRANTED. The Clerk of the Court is directed to calendar this matter for oral argument before a merits panel on the court's January 2014 oral argument docket.